**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| | * | |
| JAMES MADISON PROJECT | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Civil Action No. 08-0708 (JR) |
| | * | |
| CENTRAL INTELLIGENCE AGENCY | * | |
| | * | |
| Defendant. | * | |
| | * | |

*    *    *    *    *    *    *    *    *    *    *    *

## OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff James Madison Project ("JMP")[1] commenced this litigation pursuant to the Freedom of Information Act ("FOIA") to obtain copies of internal Central Intelligence Agency ("CIA") documents pertaining to an internal review of the CIA's Inspector General, John Helgerson ("Helgerson"), and of the Office of the Inspector General ("OIG").

The CIA has repeatedly delayed the processing of this request since October 2007, and only provided its first (and final) substantive response after JMP filed suit in April 2008. That response asserted that no documents were located. The record reflects, however, that the CIA's searches for responsive records were inadequate. As a result, this Court should deny the CIA's request for summary judgment and either require a more detailed affidavit on the adequacy of the search or allow JMP to conduct limited discovery to identify the proper scope of its response.

---

[1] JMP (*http://www.jamesmadisonproject.org*) is a Washington, D.C.-based non-profit organization that was created in 1998 for the primary purpose of educating the public on issues relating to intelligence gathering and operations, secrecy policies, national security, and government wrongdoing. Much of the work undertaken by JMP involves litigation under FOIA.

## PROCEDURAL BACKGROUND

The factual and procedural background concerning JMP's FOIA request at issue in this litigation is set out in detail in the CIA's Memorandum of Points and Authorities in Support of Defendant's Motion for Summary Judgment (filed July 14, 2008)("CIA's Memo"), the CIA's Declaration of Delores M. Nelson (dated July 14, 2008)("Nelson Declaration"), and JMP's Rule 56(f) Declaration of Bradley P. Moss, Esq. ("Moss Decl."), all of which are incorporated herein by reference.[2]

## ARGUMENT

The CIA has moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. Summary judgment should be granted only if the moving party has shown that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986); Waterhouse v. Dist. of Columbia, 298 F.3d 989, 991 (D.C. Cir. 2002). In determining whether a genuine issue of material fact exists, the Court must view all facts in the light most favorable to the nonmoving party. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). The nonmoving party's opposition, however, must consist of more than mere unsupported allegations or denials and must be supported by affidavits or other competent evidence setting forth specific facts showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(e); see Celotex Corp., 477 U.S. at 324.

---

[2] The factual statements made in the CIA's Memo and the Nelson Declaration are incorporated only in relation to pages 2 through 3 and paragraphs 15 through 19, respectively, and only to the extent that they do not constitute legal characterizations and conclusions.

In a FOIA case, the Court exercises *de novo* review and summary judgment is only available to a defendant agency that has fully discharged its obligations under FOIA. See Wolf v. CIA, 473 F.3d 370, 374 (D.C. Cir. 2007); Weisberg v. U.S. Dep't of Justice, 705 F.2d 1344, 1350 (D.C. Cir. 1983).

I.   **THE CIA FAILED TO CONDUCT AN ADEQUATE SEARCH FOR RESPONSIVE RECORDS AND GENUINE ISSUES OF MATERIAL FACT REMAIN PRECLUDING SUMMARY JUDGMENT AT THIS TIME**

   A.   **The CIA Is Unable At This Time To Demonstrate It Conducted An Adequate Search For Responsive Records**

There is no dispute regarding the overarching case law pertaining to the adequacy of an agency's search for purposes of summary judgment. The burden rests upon the defendant agency to "show beyond a material doubt that it has conducted a search reasonably calculated to uncover all relevant documents." Id. at 1351. See also Campbell v. U.S. Dep't of Justice, 164 F.3d 20, 27 (D.C. Cir. 1988)("reasonableness" standard is applied to determine the adequacy of a search methodology, consistent with congressional intent tilting the scale in favor of disclosure). Put more succinctly, the CIA "must show that it has made a good faith effort to conduct a search for the requested records, using methods which can be reasonably expected to produce the information requested." Oglesby v. U.S. Dep't of the Army, 920 F.2d 57, 68 (D.C. Cir. 1990)(citations omitted).

It is also undisputed that a court may rely upon agency affidavits in adjudicating the adequacy of the search, Founding Church of Scientology v. Nat'l Sec. Agency, 610 F.2d 824, 836 (D.C. Cir. 1979), so long as those affidavits are detailed, nonconclusory and submitted in good faith. Goland v. CIA, 607 F.2d 339, 352 (D.C. Cir. 1978); Perry v. Block, 684 F.2d 121, 127 (D.C. Cir. 1982)(*per curiam*)(highlighting that affidavits must

shed sufficient light on "scope and method of the search conducted by the agency").

"Even if these conditions are met the requestor may nonetheless produce countervailing

evidence, and if the sufficiency of the agency's identification or retrieval procedure is

genuinely in issue, summary judgment is not in order." Founding Church of Scientology,

610 F.2d at 836.  See also id. at 837 ("To accept its claim of inability to retrieve the

requested documents in the circumstances presented is to raise the specter of easy

circumvention of the Freedom of Information Act . . . and if, in the face of well-defined

requests and positive indications of overlooked materials, an agency can so easily avoid

adversary scrutiny of its search techniques, the Act will inevitably become nugatory.").

But see Wilbur v. CIA, 355 F.3d 675, 678 (D.C. Cir. 2004)("Likewise, the agency's

failure to turn up a particular document, or mere speculation that as yet uncovered

documents might exist, does not undermine the determination that the agency conducted

an adequate search for the requested records.")(citations omitted).

Therefore, the central issue here is whether the specific circumstances of the case at

bar reveal "positive indications of overlooked materials," Founding Church of

Scientology, 610 F.2d at 837, which would have been found if the CIA had conducted a

"diligent search for those documents in places in which they *might be expected to be

found*." Miller v. U.S. Dep't of State, 779 F.2d 1378, 1385 (8th Cir. 1985)(emphasis

added), cited with approval in Iturralde v. Comptroller of the Currency, 315 F.3d 311,

315 (D.C. Cir. 2003).

Relying upon the Nelson Declaration, the CIA asserts that since it: a) searched for

responsive records in at least one (1) records system in which the identified scope of

regulations would arguably be maintained; and b) utilized at least seven (7) different

4

search terms in conducting the search, there does not remain any substantial doubt as to the reasonableness of the CIA's search and therefore no genuine issue of material fact exists. CIA's Memo at 9.

The CIA's assertion to the contrary, the Nelson Declaration does not demonstrate conclusively that the CIA conducted a diligent search. As will be demonstrated infra, the bare-bones, boilerplate description detailed in the Nelson Declaration fails to provide this Court with any semblance of a comprehensive assessment of the adequacy of the CIA's search, as it lacks the specificity required by the law of this Circuit. JMP can also demonstrate that at issue here is not a "purely speculative" claim about the existence of responsive documents, see Ground Saucer Watch v. CIA, 692 F.2d 770, 771 (D.C. Cir. 1981), as JMP can identify countervailing evidence by way of at least one applicable federal statute and CIA official public statements, to say nothing of pure common sense.

At some appropriate time the CIA may in fact be entitled as a matter of law to summary judgment regarding the adequacy of its search, but based upon the current record—consisting of the Nelson Declaration—it is not yet that time.

**B. The CIA's Nelson Declaration Is Insufficient For Purposes Of Summary Judgment, As It Fails To Provide This Court With Sufficient Factual Context Within Which To Evaluate The Adequacy Of The CIA's Search**

*1. The Nelson Declaration's Description Of The Search Terms And Location Parameters Used In The CIA's Search Is Insufficiently Detailed And Leaves Open Several Evidentiary Gaps*

Agency affidavits must "explain in reasonable detail the scope and method of the search conducted by the agency [sufficient] to demonstrate compliance with the obligations imposed by the FOIA." Morley v. CIA, 508 F.3d 1108, 1121 (D.C. Cir. 2007), quoting Perry, 684 F.2d at 127. An affidavit that lacks the detail "necessary to

afford a FOIA requestor an opportunity to challenge the adequacy of the search and to allow the district court to determine if the search was adequate in order to grant summary judgment" will be deemed insufficient. See Morley, 508 F.3d at 1122 (rejecting as insufficient a CIA affidavit that failed to identify search terms, explain how the search was conducted in each component, or give an indication of what each component's search specifically yielded). Where the agency's responses raise serious doubts as to the completeness of the search or are for some other reason unsatisfactory, summary judgment in the government's favor would usually be inappropriate. Perry, 684 F.2d at 127.

The Nelson Declaration's description of the search conducted for responsive records consists largely of boilerplate language mostly devoid of any specific context.[3] It first

---

[3] The courts have previously addressed agency reliance upon boilerplate affidavits—albeit in the context of Exemption One invocations on the grounds of national security—and have permitted their use only to the extent that the agency's explanation was "sufficiently tailored" to its determination. See Coldiron v. Dep't of Justice, 310 F. Supp. 2d 44, 53 (D.D.C. 2004)(cautioning that "the court is not to be a wet blanket" and its review should not be vacuous, but ultimately conceding that the D.C. Circuit has permitted agency use of boilerplate affidavits in circumstances where the agency explanations were sufficiently tailored to the specific redactions). See also Schrecker v. Dep't of Justice, 254 F.3d 162, 166 (D.C. Cir. 2001)(relating to documents identifying confidential sources, disclosure "should be expected to reveal the identity of a confidential human source or reveal the identify of a human intelligence source when the unauthorized disclosure of that source would clearly and demonstrably damage the national security interests of the United States by harming the FBI's ability to continuously recruit sources for current and future use"); Halperin v. CIA, 629 F.2d 144, 149 (D.C. Cir. 1980)(regarding the names of CIA attorneys, disclosure would "tend to reveal details of [intelligence] activities and that representatives of hostile, foreign intelligence services working in this country who, by a variety of techniques, can undertake courses of action to ascertain what other contacts, what other locations, and then arrive at determinations whether [the CIA's attorneys are] doing any other function for the Central Intelligence Agency")(internal quotations omitted); Coldiron, 310 F. Supp. 2d at 52-54 (upholding the sufficiency of the FBI's affidavits only after concluding that the FBI indicated that disclosure of particular passages would make available the

generically describes the organization of the CIA record systems. Nelson Decl. at ¶¶ 7-9. It subsequently details the procedures by which the CIA conducts a search for records. Id. at ¶ 10. It is these procedures that are of considerable importance in assessing the adequacy of the CIA's search, as the Nelson Declaration explains that each individual CIA component devises its own search strategy for processing a FOIA request. Each individual strategy includes the identification of particular records systems that will be searched, as well as the particular search tools, indices, and terms that will be utilized in conducting the search. Id.

The Nelson Declaration, however, does not even attempt to provide this Court with an explanation of the particular strategies of the individual components tasked with conducting the search, including which particular search terms—if different—were used by each separate component. Instead, it condenses its entire explanation into two mere sentences that rely heavily upon conclusory adjectives and ambiguous language. See id. at ¶ 19 ("The CIA search *included* the Director of Central Intelligence Agency ("DCIA") area, *which includes* the records systems of the DCIA Action Center ("DAC") and the independent offices of the Office of Inspector General ("OIG"), the Office of General Counsel ("OGC"), and the Office of Public Affairs ("OPA"). These offices used a *variety* of search terms . . ., *including, for example*: 'internal review of operations,' 'CIA's Inspector General,' 'John L. Helgerson,' 'OIG,' 'Office of Inspector General,' 'OIG internal review,' and 'Deitz review.'")(emphasis added).

This explanation leaves open several evidentiary gaps, including, for example:

---

very criteria used by the FBI to decide what actions warranted an investigation and that disclosure would reveal the cooperation of foreign governments).

1) whether the CIA search included components other than the DCIA area; 2) whether the

search within the DCIA area actually involved the record systems of the DAC, OIG,

OGC and OPA; 3) whether other record systems within the DCIA area were searched;

4) which of the "example" search terms were used in which particular records systems;

5) what other search terms were used in conducting the search; and 6) whether and to

what degree the CIA revised its initial search in light of information discovered during

initial phases of the search, including information from relevant but non-responsive

documents.[4] Moss Decl. at ¶ 16, attached as Exhibit "1". Such evidentiary gaps

undermine this Court's ability to assess the adequacy of the CIA's search and render the

Nelson Declaration insufficiently detailed for purposes of summary judgment.[5]

---

[4] "Consequently, the court [should evaluate] the reasonableness of an agency's search
based on what the agency knew at its conclusion rather than what the agency speculated
at its inception." Campbell, 164 F.3d at 28.

[5] Interestingly enough, the CIA affidavit deemed insufficient by the D.C. Circuit in
Morley appears virtually indistinguishable from the Nelson Declaration.

> The [Dorn] Declaration incorporates a general explanation of how the agency
> responds to all FOIA requests, and after describing how a single FOIA request must
> be divvied up between multiple component units within the CIA, Dorn states that
> "each component must then devise its own search strategy, which includes identifying
> which of its records systems to search as well as what search tools, indices, and terms
> to employ." But the two brief paragraphs in the Declaration explaining the search
> itself provide no information about the search strategies of the components charged
> with responding to Morley's FOIA request. Dorn merely identifies the three
> directorates that were responsible for finding responsive documents *without
> "identify[ing] the terms searched or explain[ing] how the search was conducted" in
> each component*. . . . The remainder of the Declaration describes only basic CIA
> policy regarding FOIA responses and a description of the CIA's correspondence with
> Morley.

Morley, 508 F.3d at 1122 (citations omitted)(emphasis added). Similarly, the Nelson
Declaration fails to identify which particular search terms were used in relation to the
different particular components.

2.    *The Nelson Declaration Fails To Explain In Any Context The*
      *Reasonableness Of Its Imposition Of An "End-Date"*

The D.C. Circuit has previously addressed the issue of temporal limits, such as a

"time-of-request cut-off" policy, in the context of the adequacy of an agency's FOIA

search and has maintained that that the legal standard for a temporal limit is whether the

"limitation is consistent with the agency's duty to take *reasonable* steps to ferret out

requested documents." See McGehee v. CIA, 697 F.2d 1095, 1101 (D.C. Cir.

1983)(emphasis in original). See also Public Citizen Inc. v. Dep't of State, 276 F.3d 634,

643 (D.C. Cir. 2002)(reaffirming the D.C. Circuit's rejection of the CIA's contention that

the language of the FOIA and authoritative case law establishes that the use of a time-of-

request cut-off is always reasonable). The burden of demonstrating that the imposition of

a temporal limit upon a FOIA search comports with the agency's obligation to conduct a

reasonably thorough investigation rests with the agency, not the requestor. McGehee,

697 F.2d at 1101. Therefore, in the context of a motion for summary judgment, the

agency is required to demonstrate that there is no genuine issue of material fact with

respect to the reasonableness of the temporal limit. Id. at 1102.

The Nelson Declaration, for its part, fails to satisfy this burden. The CIA, by virtue of

its own statements, appears to have imposed a temporal limit on the search in the form of

an "end-date" cut-off point, namely November 5, 2007. See CIA's Memo, Exhibit "B"

("Ex. B"). See also CIA's Memo, Exhibit "D" ("Ex. D")("Our processing included a

search of records as described in our 5 November 2007 acceptance letter *existing through*

*the date of that letter*.")(emphasis added). The Nelson Declaration, however, does not

address this issue in any way, shape, or form, even if simply to reiterate that an "end-

date" for responsive records was imposed. See Nelson Decl. at ¶ 19. It does not verify if

the temporal limit was actually imposed or explain how, given the CIA's administrative delays, the limit was reasonable. The CIA's failure to even address, let alone explain, the reasonableness of the imposition of the original "end-date" constitutes further evidence of the insufficiency of the Nelson Declaration.

Even if the Nelson Declaration had addressed the issue, it is JMP's position that permitting the use of the original "end-date" would be unreasonable in light of the CIA's eight-month administrative delay in processing the search. During those eight months, during which the CIA apparently took no action on JMP's request, the "internal inquiry" was concluded and changes to the operations of the OIG and the structure of the CIA's oversight of the OIG were implemented. See, e.g., Exhibit "2" ("CIA Tells of Changes for its Internal Inquiries"); Exhibit "3" ("CIA Sets Changes to IG's Oversight, Adds Ombudsman"); Exhibit "4" (detailing the changes implemented subsequent to this review). Arguably, untold numbers of responsive records were created during those eight months. Moss Decl. at ¶ 17. Despite that fact, *after* JMP finally was forced to initiate the present litigation in order to compel the CIA to comply with its obligations under FOIA, the CIA concluded its search in "early July 2008" and chose to rely upon the original "end-date" of November 5, 2007. Nelson Decl. at ¶ 19; Ex. D. By that point, the original "end-date" was no longer reasonable and arguably should have been modified to comport with the changed circumstances. This type of behavior was rejected as unreasonable by the D.C. Circuit in McGehee[6] and is equally unreasonable here.

---

[6] The D.C. Circuit highlighted that the CIA's imposition of an "end-date" for its search to the first 35 days after the Jonestown Tragedy, despite the agency's two-and-a-half year delay in responding to McGehee's request, was not reasonable and remanded that portion of the case with instructions to the CIA to "do better than it has thus far." McGehee, 697 F.2d at 1103-04.

3. *The Nelson Declaration's Inclusion Of Irrelevant FOIA Procedures*
*Constitutes Supplemental Evidence That It Is Insufficiently Detailed*

For reasons known only to the CIA, the Nelson Declaration includes generic, boilerplate descriptions of CIA FOIA procedures pertaining to the review of responsive records for purposes of determining the applicability of FOIA exemptions, making redactions to withhold exempted information, and segregating exempt information. Nelson Decl. at ¶¶ 11-14. Given that the CIA's search failed to identify any responsive records, none of those three procedures were ever employed with respect to JMP's request.

The Nelson Declaration's inclusion of this information should raise concerns as to the CIA's good faith in its submission of an affidavit that is required to be "sufficiently detailed" and tailored specifically to this particular FOIA litigation in order to provide this Court with sufficient factual context in which to assess the adequacy of the CIA's search. Moss Decl. at ¶ 15. In effect, the Nelson Declaration's description of the CIA's search consists solely of: a) generic explanations regarding CIA's FOIA procedures (some irrelevant) and records systems; b) a recitation of JMP's FOIA request correspondence with CIA; c) two vague and insufficient sentences explaining the records system searched and search terms used; and d) one self-serving sentence asserting that the CIA's search was "diligent" and "reasonably calculated to discover" responsive records.[7] See Nelson Decl. at ¶¶ 7-19. This description does not and cannot meet the CIA's burden of providing an affidavit that is "detailed" and "nonconclusory."

---

[7] The CIA's unsubstantiated assertion that its search was diligent and adequate is of little consequence or importance in assessing whether, for purposes of summary judgment, the CIA has met its burden of demonstrating that there is no genuine issue of material fact regarding the adequacy of its search. Indeed, the D.C. Circuit has held that "[r]eliance on

The Nelson Declaration's vague description of the search terms and location parameters utilized in conducting the search, as well as its failure to explain the reasonableness underlying its imposition of the original "end-date" and its inclusion of irrelevant FOIA procedures, renders it insufficiently detailed and deprives this Court of an adequate context in which to assess the adequacy of the CIA's search. Therefore, the CIA's Motion for Summary Judgment ("CIA's Motion") should be denied pending, at a minimum, submission by the CIA of a more sufficiently detailed affidavit, if not additional searches and agency review.

> **C. JMP Can Identify Countervailing Evidence In Light Of The Applicability Of The Central Intelligence Agency Act of 1949 And CIA Official Public Statements That Raise A Genuine Issue Of Material Fact Regarding The Adequacy Of The CIA's Search**

While it is true that the inability of an agency to find a particular document does not *generally* render a search inadequate, in certain circumstances a court may place significant weight on the fact that a records search failed to turn up a particular document. See Nation Magazine, Washington Bureau v. U.S. Customs Serv., 71 F.3d 885, 892, n.7 (D.C. Cir. 1995). See also Krikorian v. Dep't of State, 984 F.2d 461, 468 (D.C. Cir. 1993)(documents not found by agency factored into court's evaluation of adequacy of search). At a minimum, JMP can direct this Court's attention to at least one federal statute that would have imposed an obligation upon the CIA to create records responsive to JMP's request. The Central Intelligence Agency Act of 1949 ("the CIA Act") mandates that the OIG prepare and submit to the CIA Director a classified semiannual report ("the IG report") summarizing the OIG's activities during the immediately-

---

affidavits to demonstrate agency compliance with the mandate of the FOIA does not, however, require courts to accept glib government assertions of complete disclosure or retrieval." Perry, 684 F.2d at 126.

preceding six-month period. 50 U.S.C. § 403q(d)(1). The CIA Director subsequently is obligated to transmit that report to the House Permanent Select Committee on Intelligence ("HPSCI") and the Senate Select Committee on Intelligence ("SSCI") with any comments he may deem appropriate. Id. See Exhibit "5" ("Semiannual Report to the Director, Central Intelligence Agency: July – December 2005").

In its original FOIA request, JMP provided the CIA with copies of news articles from October 2007 detailing the CIA's official verification that Director Hayden had authorized an "internal inquiry" into the activities of the OIG as a whole, and Helgerson in particular. CIA's Memo, Exhibit "A." See also Exhibit "6" ("CIA Chief Defends Review on Agency's Inspector General"). As indicated in a routine briefing between Helgerson and SSCI staff members in October 2007, the "internal inquiry" began in April 2007 and was being conducted by Director Hayden's senior counselor Robert L. Dietz. See Exhibit "7" ("Lawmakers Criticize CIA Director's Review Order"). In a pair of news articles dated February 2, 2008, at which point JMP's request was still being processed administratively, Director Hayden verified that the "internal inquiry" had been concluded and that Helgerson had agreed to "tighter controls" over the OIG's investigative procedures, as well as the appointment of an ombudsman and a "quality control officer" to oversee the activities of the OIG. See Exhibit "2;" Exhibit "3." See also Exhibit "4" (detailing the job responsibilities of the "quality control officer" and the ombudsman).[8]

---

[8] It should not be ignored that the CIA is, in effect, arguing that an allegedly-reasonably adequate search of its records did not find one responsive record pertaining to a ten month internal investigation which implicated not only the OIG but also included, at a minimum: a) OPA, for the comments made by Helgerson in the SSCI briefing and the press contacts by Director Hayden and CIA spokesman Paul Gimigliano; b) Office of Legislative Counsel, for the IG reports that Director Hayden was required to provide to the HPSCI and SSCI; and c) the Office of the Director, for the coordination of the

Given that the "internal inquiry" lasted approximately ten months and spanned three different reporting intervals, the OIG was obligated by the CIA Act to create at least three semiannual reports summarizing its activities that would have included references to the "internal inquiry," including: 1) efforts to cooperate with the inquiry; 2) discussions within OIG and with other CIA officials regarding possible changes to the OIG's investigative procedures and the appointment of an ombudsman and a "quality control officer;" and 3) discussions regarding the implementation of the agreed-upon changes. Director Hayden would have subsequently been required to transmit those reports to the HPSCI and SSCI. The CIA's failure to locate these records is assuredly a relevant factor for this Court to consider in evaluating the reasonableness of the CIA's search.[9]

In light of the insufficiency of the Nelson Declaration and JMP's identification of countervailing evidence in the form of at least one statutory provision that required the CIA to produce responsive records, the CIA has failed to meet its burden of demonstrating that there are no genuine issues of material fact pertaining to the adequacy of its search. Therefore, the CIA's Motion should be denied pending, at a minimum,

---

"internal inquiry" with Director Hayden's senior counselor, Robert L. Dietz. On its own, this failure would not necessarily be sufficient to raise a genuine issue of material fact, but when combined with the insufficient explanations in the Nelson Declaration of the CIA's search and the CIA's failure to identify the three IG reports whose creation was statutorily-mandated, the fact that the CIA could not identify a single responsive record pertaining to this investigation is highly suspect.

[9] The fact that JMP's original FOIA request does not specifically seek records pertaining to the ultimate conclusions of the "internal inquiry" does not render unresponsive the reports created in compliance with the CIA Act. The D.C. Circuit has previously held that agencies have a duty to construe FOIA requests *liberally* to ensure responsive records are not overlooked. See Valencia-Lucena, 180 F.3d at 326. A reasonable, liberal construction of JMP's request for "documents pertaining to discussions concerning the decision to initiate an internal review" of the OIG would include records that reference the internal review itself.

submission by the CIA of a more sufficiently detailed affidavit, if not the completion of additional searches and agency review.

## II. ALTERNATIVELY, JMP IS ENTITLED TO CONDUCT LIMITED DISCOVERY TO ASCERTAIN THE ADEQUACY OF THE CIA'S SEARCH

Discovery is a permissible and useful tool in the proper judicial administration of the FOIA with regard to agency searches that are inadequate. "If a party opposing [a motion for summary judgment] shows by affidavit that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: . . . order a continuance to enable affidavits to be obtained, depositions to be taken, or other discovery to be undertaken . . . ."[10] Fed. R. Civ. P. 56(f). Since in most FOIA cases the government possesses all of the relevant evidence, it is permissible to use discovery to uncover facts to determine the adequacy of the government's search or the exempt status of requested documents. See Weisberg v. Webster, 749 F.2d 864, 868 (D.C. Cir. 1984).[11] Given the insufficiency of the Nelson Declaration and the subsequent inability by the CIA to demonstrate that it conducted an adequate and reasonable search, discovery is necessary and permitted. See,

---

[10] While some recent unpublished opinions have interpreted this to mean that "a FOIA plaintiff generally 'must establish how the specific discovery requested would create a genuine issue of material fact.'" Morley v. CIA, 2006 WL 280645, *1 (D.D.C. Feb. 6, 2006), quoting Center for Nat'l Security Stud. v. Dep't of Justice, 2002 U.S. Dist. LEXIS 2983, *4 (D.D.C. Feb. 21, 2002), this interpretation is an oversimplification of the original ruling that "[c]onclusory allegations unsupported by factual data will not create a triable issue of fact." Marks v. Dep't of Justice, 578 F.2d 261, 263 (9th Cir. 1978), cited by Exxon Corp. v. Federal Trade Com., 663 F.2d 120, 127 (D.C. Cir. 1980), cited by Carpenter v. Fannie Mae, 174 F.3d 231, 237 (D.C. Cir. 1999). Under this original interpretation, this Court should find the factual data and logical inferences presented by JMP sufficient to pass the Marks test.

[11] While the court was addressing the particular right of the government to utilize discovery, it affirmed that right by stating that the government, "like any other litigant," should be able to utilize the rules of discovery. Weisberg, 749 F.2d at 868.

15

e.g., Weisberg, 705 F.2d at 1348 (permitting discovery to resolve material factual dispute regarding adequacy of search).

Discovery does not need to be overly burdensome or excessive in scope. At a minimum, a limited number of interrogatories and depositions will be necessary to identify the full scope of responsive documents that exist and assess whether the CIA's search methodology was reasonably calculated to uncover all responsive documents in light of that information. Discovery would address several previously-identified gaps in the CIA's description of its search for records, including, for example: 1) which particular search terms were utilized with respect to different particular components or offices; 2) to what extent, if any, the CIA revised its search in light of identification of relevant yet non-responsive documents; and 3) whether the original "end-date" was imposed as a limitation on the search. Moss Decl. at ¶ 18.

## <u>CONCLUSION</u>

For the foregoing reasons, the CIA's Motion for Summary Judgment should be

denied, pending the submission by CIA's counsel of a more sufficiently detailed

affidavit, or, alternatively, JMP should be permitted to undertake limited discovery.

Date:    August 11, 2008

Respectfully submitted,

/s/

_____
Bradley P. Moss, Esq.
D.C. Bar #975905
Mark S. Zaid, Esq.
D.C. Bar #440532
Mark S. Zaid, P.C.
1250 Connecticut Avenue, N.W.
Suite 200
Washington, D.C. 20036
(202) 454-2809
(202) 330-5610 fax
Brad@MarkZaid.com
Mark@MarkZaid.com

Kelly Brian McClanahan
NYS Bar #4563748
Mark S. Zaid, P.C.
1250 Connecticut Avenue, N.W.
Suite 200
Washington, D.C.  20036
Kel@JamesMadisonProject.org

Of Counsel

<u>James Madison Project v. CIA</u>, Civil Action No. 08-0708 (D.D.C.)(JR)

# EXHIBIT "1"

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| THE JAMES MADISON PROJECT | * <br> * <br> * |
| Plaintiff, | * <br> * |
| v. | * |
| CENTRAL INTELLIGENCE AGENCY | * <br> * <br> * |
| Defendant. | * <br> * |

Civil Action No. 08-0708 (JR)

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

**RULE 56(f) DECLARATION OF**
**DEPUTY EXECUTIVE DIRECTOR BRADLEY P. MOSS, ESQ.**

I, BRADLEY P. MOSS, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1.   I am a person over eighteen (18) years of age and competent to testify. I make this Declaration on personal knowledge and in support of the plaintiff's Opposition to Defendant's Motion for Summary Judgment (filed August 11, 2008).

2.   I am the Deputy Executive Director of the plaintiff James Madison Project ("JMP") and have served in that position since 2007. JMP is a Washington, D.C.-based non-profit organization created for the primary purpose of educating the public on issues relating to intelligence gathering and operations, secrecy policies, national security and government wrongdoing. Much of the work undertaken by JMP involves litigation under disclosure acts such as the Freedom of Information Act ("FOIA"). The principles underlying the objectives of the JMP are derived from the 1997 findings of the Commission on Protecting and Reducing Government Secrecy. Our website, which contains further information and examples of JMP's activities, can be viewed at *http://www.JamesMadisonProject.org*.

3.   I am also an attorney of record in this litigation for JMP. I am admitted to practice law in the State of Illinois and the District of Columbia, as well as the D.C. Circuit and the United States District Courts for the District of Columbia, Maryland, and Northern District of Illinois.

**Procedural Background**

4.   By letter dated October 18, 2007, I submitted on behalf of JMP's Executive Director, Mark S. Zaid, a FOIA request to the Central Intelligence Agency ("CIA") which sought copies of all internal CIA documents pertaining to discussions concerning the decision to initiate an internal review of the operations of the CIA's Inspector General ("IG"), John Helgerson, and of the IG's Office as a whole. I enclosed with the request copies of newspaper articles from the *New York Times*, *Los Angeles Times*, and *USA Today* that confirmed that the CIA's Director General Michael Hayden ("Director Hayden") had ordered an internal review. The letter also stated that JMP was seeking expedited processing of the request as well as a fee waiver

5.   By letter dated November 5, 2007, the CIA acknowledged receipt of the request and assigned it Request No. F-2008-00103. The letter noted that the CIA was granting JMP the fee waiver for the request, but that it was denying expedited processing. The letter also stated that, unless JMP objected, the CIA would limit its search to CIA-originated records existing as of the date of the letter.

6.   JMP did not object to the temporal limit being imposed upon the parameters of the CIA's search at that point in time, or the limitation to CIA-originated records.

7.   On February 21, 2008, having not received any further response from the CIA since the acceptance letter, I contacted the CIA's FOIA Requester Service Center ("FOIA

Center") seeking a status update. I was informed by a FOIA Center staff member that the request was still being processed and that no additional information could be provided. I was also told that, due to the routine backlog, delays should be expected but that the FOIA Center was attempting to work through the backlog as quickly as possible.

8.  By letter dated March 3, 2008, the CIA memorialized the substance of the conversation I had had with the FOIA Center, namely, that the request was still being processed and that there was a significant backlog causing the delay in the CIA's response.

9.  No further responses were ever received from the CIA. Therefore, after more than five months of administrative delay, and with no identifiable timeframe in which the CIA was planning to fulfill its legal obligations under the FOIA, JMP filed suit in this Court on April 21, 2008.

10. By e-mail dated June 4, 2008, Judith Kidwell ("Ms. Kidwell"), the Department of Justice attorney representing the CIA, sought my consent for her motion for enlargement of time. On that same day, I talked with Ms. Kidwell via telephone and indicated my consent to her motion for enlargement of time. This constituted the only attempt ever made by Ms. Kidwell to discuss the present case with me prior to the filing of dispositive motions.

11. By letter dated July 11, 2008, the CIA informed JMP that it had conducted a search for records responsive to JMP's request and that the search had not identified any responsive records. The letter stated that the search had been conducted for responsive records that existed as of November 5, 2007, the date of the original acceptance letter by the CIA.

12. On July 14, 2008, the CIA filed its Motion for Summary Judgment, claiming that it had conducted an adequate search for responsive records and that there was no genuine issue of material fact with regard to the adequacy of the search.

### Substantive Response On Adequacy Of The Search

13. The CIA relies on the Declaration of Delores M. Nelson, Chief, Public Information Programs Division, Information Review and Release Group, Information Management Services, Office of the Chief Information Officer (dated July 14, 2008) ("Nelson Declaration")(cited as "Nelson Decl.") to support its determination that the search conducted was adequate.

14. For approximately eighteen (18) months, as both a private attorney and as the Deputy Executive Director of JMP, I have participated in the litigation of several FOIA lawsuits. See, e.g., SAE Productions, Inc. v. Federal Bureau of Investigation, Civil Action No. 07-0866 (D.D.C.)(JR); The James Madison Project v. Central Intelligence Agency, Civil Action No. 07-01154 (D.D.C.)(RMU); The James Madison Project v. Central Intelligence Agency, Civil Action No. 07-01382 (D.D.C.)(RMU); The James Madison Project v. Central Intelligence Agency, Civil Action No. 07-02306 (D.D.C.)(RBW). In each of those cases, the agency's FOIA declaration has tended to be filled with pages upon pages of generalized boilerplate descriptions of the process by which the agency coordinates FOIA requests and how generic classification determinations are rendered. Ms. Nelson's declaration is no different.

15. Indeed, Ms. Nelson chose to include three entire paragraphs containing generic, boilerplate information pertaining to FOIA exemption and segregability determinations. Nelson Decl. at ¶¶ 12-14. Given that the CIA's search did not identify any responsive

records, the CIA did not even have to conduct any FOIA exemption or segregability determinations. Ms. Nelson's inclusion of the irrelevant information should raise concerns as to the CIA's good faith in its submission of an affidavit that is required to be "sufficiently detailed" and to provide this Court with sufficient factual context in which to assess the adequacy of the CIA's search. The rest of Ms. Nelson's declaration does little to assuage those concerns.

16. Specifically, the CIA fails to sufficiently describe the scope of search terms and location parameters utilized in conducting its search. The entirety of its explanation consists of two mere sentences that rely heavily upon conclusory adjectives and ambiguous language. See Nelson Decl. at ¶ 19 ("The CIA search *included* the Director of Central Intelligence Agency ("DCIA") area, *which includes* the records systems of the DCIA Action Center ("DAC") and the independent offices of the Office of Inspector General ("OIG"), the Office of General Counsel ("OGC"), and the Office of Public Affairs ("OPA"). These offices used a variety of search terms . . . , *including, for example*: 'internal review of operations,' 'CIA's Inspector General,' 'John L. Helgerson,' 'OIG,' 'Office of Inspector General,' 'OIG internal review,' and 'Deitz review.'") (emphasis added). This explanation leaves open several evidentiary gaps, including, for example: 1) whether the CIA search included components other than the DCIA area; 2) whether the search within the DCIA area actually involved the record systems of the DAC, OIG, OGC and OPA; 3) whether other record systems within the DCIA area were searched; 4) which of the "example" search terms were used in which particular records systems; 5) what other search terms were used in conducting the search; and 6) whether and to what degree the CIA revised its initial search in light of information discovered

5

during initial phases of the search, including information from relevant but non-responsive documents.

17. Furthermore, the Nelson declaration does not address, let alone explain, how the imposition of the original "end-date", November 5, 2007, was still reasonable at the time that the CIA's search was conducted. The internal review authorized by Director Hayden reached its conclusion in February 2008, resulting in the creation of an ombudsman and a "quality control officer" to oversee the Office of the Inspector General ("OIG"), as well as the imposition of modified controls on the OIG's investigative procedures. See Exhibit "2;" Exhibit "3." In addition, the OIG was required by the Central Intelligence Agency Act of 1949 ("CIA Act") to create three reports during the course of the "internal inquiry" detailing the activities of the OIG; those reports would, by necessity, have included information concerning the "internal inquiry" and the changes that were implemented as a result. At least one of those reports was submitted by Director Hayden to Congress's two intelligence committees.[1] Arguably all of this information would have fallen within the scope of JMP's request.

18. Because material facts, such as described above, still remain at issue regarding the adequacy of the CIA's search, the CIA's Motion for Summary Judgment should be denied pending, at a minimum, the submission of a more sufficiently detailed CIA affidavit. Alternatively, JMP should be permitted to undertake limited discovery in order to address the disputes surrounding the adequacy of CIA's search. Discovery need not be overly burdensome or excessive in scope. A limited number of interrogatories and

---

[1] Due to the unclear language in the CIA Act regarding the timing of the CIA Director's submission of these reports to Congress, it is impossible to tell exactly how many reports Director Hayden should have submitted to Congress by this time.

depositions will be necessary to identify the full scope of responsive regulations that exist and assess whether the CIA's search methodology was reasonably calculated to uncover all responsive documents in light of that information. Discovery would address several previously-identified gaps in the CIA's description of its search for records, including, for example: (1) which particular search terms were utilized with respect to different particular components or offices; (2) to what extent, if any, the CIA revised its search in light of identification of relevant yet non-responsive documents; and (3) whether the original "end-date" was imposed as a limitation on the search.

I do solemnly affirm under the penalties of perjury and upon personal knowledge that the contents of the foregoing paper are true to the best of my knowledge.

Date:   August 11, 2008

/s/
_____
Bradley P. Moss

<u>James Madison Project v. CIA</u>, Civil Action No. 08-0708 (D.D.C.)(JR)

# EXHIBIT "2"





February 2, 2008

# C.I.A. Tells of Changes for Its Internal Inquiries

By **MARK MAZZETTI**

WASHINGTON — After an internal inquiry that put his office under unusual scrutiny, the inspector general of the Central Intelligence Agency has agreed to a series of changes in the way the office conducts its investigations of the agency's practices, the C.I.A. director confirmed on Thursday in a message to agency employees.

Among the changes announced by the director, Gen. Michael V. Hayden, were new procedures to allow agency officers to lodge complaints against the inspector general's office, which is an independent auditor over the agency's internal affairs.

General Hayden said the changes were intended to "heighten the efficiency, assure the quality and increase the transparency of the investigative process."

The internal inquiry, unusual in its focus on investigators who usually ask the hard questions rather than answering them, had created anxiety among some inside the office of the inspector general, John L. Helgerson, and drew criticism from lawmakers who said the review was inappropriate and could have a chilling effect on inquiries into questionable conduct by the agency.

Started in April, the review was led by Robert L. Deitz, a close aide to General Hayden.

It was begun after complaints from C.I.A. officers that Mr. Helgerson's office had not been an impartial judge of agency operations and had begun crusading against controversial agency programs.

Some complained that inspector general investigations were unnecessarily long and resulted in huge legal bills for agency employees whose work was under review.

As an example, they cite an investigation into the shooting down of a missionary plane in 2001 by Peruvian troops advised by C.I.A. officers. The investigation has lasted nearly seven years and remains incomplete.

In his message to agency employees, General Hayden said the inspector general's office would now have an ombudsman to hear complaints from C.I.A. officers and to ensure the fairness of internal agency investigations.

He also said that the inspector general's office was installing new equipment to allow investigators to record interviews and create a more permanent record of investigations. In addition, a new position of quality control officer is being established inside the office to attest, as General Hayden put it, "that reports include all exculpatory and relevant mitigating information."

A C.I.A. spokesman said Mr. Helgerson supported the steps General Hayden outlined.

Senator Ron Wyden of Oregon, a Democratic member of the Intelligence Committee, did not challenge any of the conclusions laid out by General Hayden but said the inquiry "should never have happened and can't be allowed to happen again."

"I'm all for the inspector general taking steps that help C.I.A. employees understand his processes, but that can be done without an approach that can threaten the inspector general's independence," Mr. Wyden said.

Congress created the position of C.I.A. inspector general in 1989, in part to prevent a repeat of the sort of agency misdeeds revealed during the Iran-contra affair. The position is appointed by the president and reports both to Congress and the C.I.A. director.

The inspector general has investigated some of the C.I.A.'s most secret operations since the Sept. 11 attacks, including the program of detaining and interrogating top Qaeda suspects in secret overseas prisons.

A report by Mr. Helgerson's office completed in April 2004 concluded that some C.I.A.-approved interrogation methods appeared to constitute cruel, inhuman and degrading treatment, as defined by the international Convention Against Torture.

Copyright 2008 The New York Times Company

Privacy Policy | Search | Corrections | **RSS** | First Look | Help | Contact Us | Work for Us | Site Map

# EXHIBIT "3"

washingtonpost.com

# CIA Sets Changes To IG's Oversight, Adds Ombudsman

By Joby Warrick
Washington Post Staff Writer
Saturday, February 2, 2008; A03

Advertisement



The CIA's inspector general has agreed to tighter controls over its investigative procedures, agency officials revealed yesterday, in what appeared to be an attempt to soften resentments among agency officials over the watchdog's aggressive probes into the legality and effectiveness of the CIA's counterterrorism efforts and detention programs.

The revisions, which include the appointment of a special ombudsman to oversee the IG's work, were disclosed by CIA Director Michael V. Hayden in an e-mail sent to employees, announcing the end of an unusual inquiry into the performance of Inspector General John L. Helgerson, a 36-year CIA veteran and the man chiefly responsible for the spy agency's internal oversight.

The inquiry, begun last year, had raised concern among lawmakers who worried that the CIA was seeking to undermine the independence of Helgerson and his staff of auditors and inspectors. Helgerson angered top officials at the agency after leading aggressive investigations into the CIA's performance before the Sept. 11, 2001, terrorist attacks, as well as its use of secret prisons and harsh interrogation methods against suspected terrorists.

Hayden, in the note to employees, praised Helgerson and his staff as being "committed to performing investigations . . . of the highest quality, integrity and timeliness," but said the inspector general had agreed on the need for changes.

"John has chosen to take a number of steps to heighten the efficiency, assure the quality and increase the transparency of the investigation process," Hayden said in the e-mail.

The changes include measures intended to speed up investigations and require the watchdog to keep CIA employees and managers informed about both the process and results of investigations. In addition to appointing an ombudsman, Helgerson also agreed to name a "quality control officer" who would make sure that reports "include all exculpatory and relevant mitigating information," Hayden said.

The agency did not make Helgerson available for comment, but CIA spokesman Paul Gimigliano said the inspector general had "concurred with the director's statement and was comfortable with the steps agreed upon."

Helgerson, who joined the CIA in 1971, wrote a report that harshly criticized the agency for failing to anticipate al-Qaeda's attacks on the World Trade Center and the Pentagon on Sept. 11, 2001. That report, parts of which were released last fall under a congressional order, recommended that some CIA officials be held accountable for failing to do more to prevent the attacks. But the agency's then-management decided against sanctions.

Helgerson also drafted a classified report critical of the CIA's interrogation of top al-Qaeda suspects. The report said the use of waterboarding and other aggressive interrogation methods by CIA officers violated the Geneva Conventions' ban on torture.

View all comments that have been posted about this article.

**Post a Comment**

**View all comments** that have been posted about this article.

You must be logged in to leave a comment. Login | Register

Submit

Comments that include profanity or personal attacks or other inappropriate comments or material will be removed from the site. Additionally, entries that are unsigned or contain "signatures" by someone other than the actual author will be removed. Finally, we will take steps to block users who violate any of our posting standards, terms of use or privacy policies or any other policies governing this site. Please review the full rules governing commentaries and discussions. You are fully responsible for the content that you post.

© 2008 The Washington Post Company

**Ads by Google**

**10 Rules of Flat Stomach**
Cut Down 9 lbs of Stomach Fat every 11 Days by Keeping these 10 Rules.
FatLoss4Idiots.com

**Hugh Downs Reports**
Little known heart attack symptom many people tragically ignore.
www.bottomlinesecrets.com

**Identify Chemical Agents**
Ahura Scientific for immediate ID of explosives and chemical agents.
www.ahurascientific.com

James Madison Project v. CIA, Civil Action No. 08-0708 (D.D.C.)(JR)

# EXHIBIT "4"

POGO.ᴏʀɢ **Project On Government Oversight**

**home**     **about us**     **investigations**     **press room**     **get involved**     **donate**

## Updating the Record

Our friend smintheus on Daily Kos blogged earlier this week about the changes being voted upon in the Senate to the Foreign Intelligence Surveillance Act, or FISA, the law that is supposed to govern electronic surveillance in national security cases, that was ignored when the NSA began its secret warrantless wiretapping of Americans believed to have ties to al-Qaeda.  The blog made the point that relying on four inspectors general to report to Congress in the future on such programs may be futile, since the IGs in question frequently lack the independence or resources necessary to accomplish such a mission.

Although smintheus was generous in his crediting of POGO, and our ongoing project examining the IG law and how it works (or doesn't), he quoted a passage from our report from February this year that we can now actually update and clarify.  We had noted with alarm that CIA Director Michael Hayden had launched a "management review" of CIA Inspector General John Helgerson.  We had termed this "perhaps the most astonishing known infringement of an IG's independence," and lamented the unprecedented interference with the IG's mandate.  We noted that published reports "have stated that the IG has changed procedures and will install an 'ombudsman' in his office.  It appears that this solution has been imposed on the IG against his will, and may have seriously damaged his independence."

Since that was written and published, we've continued talking to people in the IG community and on the Hill, and can now report that not only did IG Helgerson not have any solution imposed upon him against his will, but in fact he turned down at least two recommendations that had been proposed by the management review team.

First, the review team had recommended the creation of a new position that would serve as both quality control officer and ombudsman.  Helgerson decided on his own to create two new positions: a quality control officer to look over investigative reports before they reached Helgerson and his top deputies; and an ombudsman to handle complaints about fairness and treatment.  But in both cases, Helgerson chose the officers now assigned to those posts, and they report directly to him, not to agency management.

Helgerson has told Hill staff that Hayden had promised him all along that he would only implement the recommendations that Helgerson thought made sense.  In fact, POGO has been told, there were two recommendations to which the IG flatly said "no way": 1)

the idea that the Director should play a role in the appointment of staff in the IG's office. Helgerson said it was clear to him that such interference would violate the statute [NOTE: the CIA IG was actually created by a separate law from most IGs, but the CIA statute very closely tracks the IG law]; and 2) the idea that the IG's legal counsel should report to the agency's general counsel. Here again, Helgerson replied that the CIA IG's shop had always had its own counsel who reports directly to the IG.

We're told that Helgerson further informed the Director that pending legislation to change the IG law would have to be reviewed, and if it passes, it may be necessary for Helgerson to recommend that the separate CIA IG statute be similarly amended. Helgerson has been assured by Hill staffers that anything they do will serve only to strengthen, not weaken, the IGs' powers.

We are particularly happy to set this record straight because there are some out there in the anti-IG community who have seized upon the CIA episode to send "attaboys" to Director Hayden. We are glad to say that praise seems to have been misinformed and misdirected.

-- Beverley Lumpkin

July 10, 2008 in Watching the Watchdogs | Permalink

<u>James Madison Project v. CIA</u>, Civil Action No. 08-0708 (D.D.C.)(JR)

# EXHIBIT "5"

APPROVED FOR RELEASE
DATE: FEB 2007

~~SECRET~~/

(b)(1)
(b)(2)
(b)(3)
(b)(5)
(b)(7)(a)

*Central Intelligence Agency*
*Inspector General*



# SEMIANNUAL REPORT

## TO THE DIRECTOR, CENTRAL INTELLIGENCE AGENCY

### JULY - DECEMBER 2005

*John L. Helgerson*
*Inspector General*

**Copy** 0024

~~SECRET~~/

SECRET/

# TABLE OF CONTENTS

PAGE

(U) A MESSAGE FROM THE INSPECTOR GENERAL ................. 1

(U) STATUTORY REQUIREMENTS ..................................... 5

(U) AUDITS ............................................................... 7

    (U) AUDIT STAFF OVERVIEW ...................................... 7
    (U) SIGNIFICANT COMPLETED AUDITS ........................... 8
    (U) STATUS OF SIGNIFICANT RECOMMENDED ACTIONS
        OUTSTANDING FROM PREVIOUS SEMIANNUAL REPORTS ..... 15
    (U) SUMMARIES OF SELECTED CURRENT AUDITS ......................... 40

(U) INSPECTIONS ..................................................... 41

    (U) INSPECTION STAFF OVERVIEW ........................... 41
    (U) SIGNIFICANT COMPLETED INSPECTIONS ..................... 42
    (U) STATUS OF SIGNIFICANT RECOMMENDED ACTIONS
        OUTSTANDING FROM PREVIOUS SEMIANNUAL REPORTS ..... 53
    (U) SUMMARIES OF CURRENT INSPECTIONS ................... 56

(U) INVESTIGATIONS ................................................ 59

    (U) INVESTIGATIONS STAFF OVERVIEW ......................... 59
    (U) SIGNIFICANT COMPLETED INVESTIGATIONS ............... 61
    (U) STATUS OF SIGNIFICANT RECOMMENDED ACTIONS
        OUTSTANDING FROM PREVIOUS SEMIANNUAL REPORTS ..... 62
    (U) SUMMARIES OF SELECTED CURRENT INVESTIGATIONS ......... 63

(U) SPECIAL REVIEWS ................................................ 69

    (U) STATUS OF SIGNIFICANT RECOMMENDED ACTIONS
        OUTSTANDING FROM PREVIOUS SEMIANNUAL REPORTS ..... 69

SECRET/

SECRET/

## (U) ANNEX SECTION
  (U) STATISTICAL OVERVIEW
  (U) COMPLETED AUDITS
  (U) CURRENT AUDITS
  (U) COMPLETED INSPECTIONS
  (U) CURRENT INSPECTIONS
  (U) COMPLETED INVESTIGATIONS
  (U) CURRENT INVESTIGATIONS

SECRET/

SECRET/

# (U)  A Message From the Inspector General

 *The work of the Office of Inspector General (OIG) during this reporting period continued to concentrate on Agency activities in Iraq and the war on terrorism.  Ongoing Iraq investigations focus on the circumstances surrounding the movement, confinement, and in some cases, alleged mistreatment of detainees.*

*OIG also is investigating a number of incidents concerning the extraterritorial transfers of individuals and alleged abuse during detentions outside Iraq.  As a result of an investigation of a case in Afghanistan, a former Agency contractor has been indicted on four felony charges of assault of a detainee, who died.  The trial, which has been rescheduled for early 2006, will represent the first US prosecution of a civilian for abuses committed in Afghanistan.  OIG continues to work closely with the Departments of Justice and Defense, as appropriate, and has briefed the intelligence oversight committees regularly on developments in these inquiries.*

*OIG is working with relevant Agency components to ensure implementation of recommendations stemming from several counterterrorism-related inquiries.  In May 2004, OIG completed a special review of management practices associated with a          covert action program                      Ten significant recommendations concerning review, revalidation, or*

SECRET/

modification of the program resulted.  Action has been completed on most of the recommendations, and Agency managers continue to work to complete action on the two outstanding recommendations.

A second recommendation has been satisfied with issuance of updated guidelines on medical care for detainees. One other recommendation remains outstanding.  As a result of a separate investigation into the circumstances surrounding

Two recommendations have been closed.

(U/            As a result of investigations, an employee reimbursed the government $8,800 for embezzlement of funds after the Department of Justice declined prosecution.  Another employee reimbursed $4,500 for receipt of duplicate funds for training.  In a third case involving civil service annuity fraud investigated in conjunction with the Inspector General of the Office of Personnel Management, the government recovered $107,958.  In a fourth case, the government recovered $45,045 for unauthorized cell phone use.  In two other cases, a contractor reimbursed the government $11,217 for hours mischarged by an employee and an independent contractor made reimbursement of $10,724 for mischarged hours.  The Investigations Staff is conducting a variety of other investigations, including possession of child pornography, unauthorized shipments of firearms, misappropriation of funds, fraud, and false statements and claims.

(U/            Personnel recruitment for the Investigations Staff remains a priority, owing to Staff turnover and the continually expanding workload.  Three experienced Agency officers have been hired as investigators, and employment offers have been extended to six other individuals with Federal law enforcement experience.

(U/            As reported in the previous Semiannual Report, in late June the OIG completed a special review of accountability issues identified in the findings and recommendations of the Congressional Joint Inquiry

Report on 9/11. While that review found that Agency officers worked hard against the al-Qa'ida target, it concluded that, with respect to certain matters, the Agency and its officers did not discharge their responsibilities in a satisfactory manner. It recommended that the Director, CIA establish an Accountability Board to review the performance of some individuals in regard to these failures. In September, the IG briefed the report's findings to the Senate Select Committee on Intelligence, the House Permanent Select Committee on Intelligence, and the House Minority Leader.

(U/          In October, the Director, CIA announced that he would not convene an Accountability Board as the IG had recommended. The Director expressed appreciation for OIG's work, crediting in particular, its assessment of pre-9/11 systemic problems within the Agency. Agency Information Review Officers are currently reviewing the report in response to several Freedom of Information Act requests.

          During this reporting cycle, the Inspection Staff completed inspections of three components and four issues. The Staff issued reports on Europe Division in the National Clandestine Service; the Office of Asian Pacific, Latin American, and African Analysis in the Directorate of Intelligence (DI); and CIA University. It also completed inspections on Research and Development in the Agency, Leadership Analysis in the DI, and the DI's Senior Analytic Service, as well as a "Review of CIA's Pre-9/11 Reporting on the Relationship Between Saddam's Regime and al-Qa'ida," which Congress had requested. In the latter case, the review found that relevant CIA reporting in the decade before 9/11 was limited to 66 reports and generally involved isolated occurrences that do not establish patterns suggesting an organized or centrally managed relationship.

(U/          The Inspection Staff continued its outreach program to inspection and evaluation staffs in other agencies. Inspectors from the Defense Intelligence Agency and the Department of Defense completed the Staff's New Inspector Training Course in August. In addition, the Inspection Staff has met several times with the Office of the Director of National Intelligence IG to discuss inspection practices and procedures.

SECRET/

[ ]  The Audit Staff completed the first audit that is a part of an initiative started during the last reporting period to provide more oversight on the effectiveness of project management throughout the Agency. The *audit evaluated Facilities Support's project management practices at the*

(U)  The Staff completed its second annual audit of the CIA's financial statements (for fiscal year 2005). The Staff is currently performing audits of four covert action programs. In the information technology area, the Staff completed an audit of the Agency's management of laptop computers, and is performing a review of information security at field stations.

John L. Helgerson
17 January 2006

SECRET/

# (U)  STATUTORY REQUIREMENTS

(U)  This report is submitted pursuant to section 17 of the CIA Act of 1949, as amended, which requires the Inspector General to provide to the Director, CIA, not later than 31 January and 31 July of each year, a semiannual report summarizing the activities of the OIG for the immediately preceding six-month periods, ending 31 December and 30 June, respectively.

(U)  All audit activities of the OIG are carried out in accordance with generally accepted government auditing standards.  All OIG inspection and investigation activities conform to standards promulgated by the President's Council on Integrity and Efficiency.

(U)  The OIG has had full and direct access to all Agency information relevant to the performance of its duties.

(U)  **Subpoena Authority**

(U/          ) During this reporting period, the IG did not issue any subpoenas.

(U)  **Legislative Proposals**

(U)  OIG has no proposals for legislative changes.

SECRET/

SECRET/

6

SECRET/

SECRET/

# (U) AUDITS

### (U) AUDIT STAFF OVERVIEW

(U/          ) The Audit Staff conducts performance and financial statement audits of Agency programs and activities, and participates with other agencies in joint reviews of Intelligence Community (IC) programs and activities.  During this period, the Audit Staff completed 11 audits of Agency facilities management, financial management, information technology, field stations, and other CIA activities.

          The Audit Staff completed the first audit that is a part of an initiative started during the last reporting period to provide more oversight of the effectiveness of project management throughout the Agency.  The audit evaluated Facilities Support's project management practices at                        While Facilities Support's management requested the audit, the Staff is proactively performing and planning additional audits that focus on project management.

(U)  The Staff completed work on the statutory audit of the CIA's financial statements for fiscal year (FY) 2005.  The Staff completed the second audit of this annual requirement on schedule in November 2005.  The report contains 18 recommendations, and it encompasses the status of management's progress on recommendations from the FY 2004 audit.

(U)  The Audit Staff also continues to pursue its program, as requested by Congress, to audit each covert action program (or an aspect of each program) at least every third year.  The Staff is currently performing audits of four covert action programs.  In the information technology area, the Staff completed an audit of the Agency's management of laptop computers and is performing a review of information security at field stations.

SECRET/

8

SECRET//

9

SECRET/

SECRET//

SECRET/

11

SECRET/

12

SECRET/

13

SECRET/

14

SECRET//

SECRET//

SECRET/

16

SECRET/

SECRET//

17

SECRET/

18

SECRET/

19

SECRET/

SECRET/

SECRET/

SECRET /

22

SECRET /

SECRET/

SECRET/

SECRET//

SECRET//

SECRET/

SECRET/

SECRET/

SECRET/

SECRET/

SECRET/

SECRET/

SECRET/

SECRET/

SECRET/

34

SECRET/

SECRET/

SECRET/

36

SECRET/

SECRET/

SECRET/

SECRET/

SECRET/

SECRET/

39

SECRET/

40

SECRET//

# (U)  INSPECTIONS

## (U) INSPECTION STAFF OVERVIEW

(U/☐)    The Inspection (INS) Staff is responsible for conducting inspections of Agency programs and operations to evaluate their efficiency and effectiveness and their compliance with law, Executive orders, and regulations.

(U/☐)    During the current reporting period, the Staff completed inspections of the Office of Asian Pacific, Latin American, and African Analysis (APLAA) in the Directorate of Intelligence (DI); CIA University (CIAU); Europe (EUR) Division in the Directorate of Operations (DO);[4] Research and Development (R&D) in the CIA; Leadership Analysis in the DI (a follow-up to the Staff's inspection of that issue in 2001); the DI's Senior Analytic Service; and a *Review of CIA's Pre-9/11 Reporting on the Relationship Between Saddam's Regime and al-Qa'ida,* which was mandated by Congress.  In addition, the Staff continued its inspection on Agency Performance on North Korea and began inspections of the CounterTerrorism Center (CTC) in the National Clandestine Service (NCS), the DI's Office of Near East and South Asian Analysis, Information Management Services in the Directorate of Support (DS), and Agency Performance on Russia.

(U/☐)    The Inspection Staff continues to conduct a two-week course for new inspectors and a seminar for team leaders before the start of each inspection cycle.  The Staff also provides instructional seminars for OIG inspectors and research assistants during the course of each cycle, instituted in response to the increasing sophistication of the Staff's methodology.

---

[4] (U) While the titles of CIA's directorates and directorate heads recently changed, this section of the report uses the titles in effect at the time that the inspections took place.

SECRET//

MORI DocID: 6409347

SECRET/

(U/ ) In addition, the Inspection Staff continues to utilize an independent contractor to track, monitor, and pursue compliance with recommendations. The Staff has closed five inspections—Global Support; the Office of Transnational Issues in the DI; Director of Central Intelligence (DCI) Center for Weapons Intelligence, Nonproliferation, and Arms Control (WINPAC); and Latin America (LA) Division in the DO — that were open as of 1 July 2005. INS closed the Global Support inspection because the period covered by five semiannual reports has elapsed and several recommendations—none of which are significant—remain unsatisfied.

SECRET/

MORE DocID: 1409347

SECRET/

SECRET/

SECRET/

44

SECRET/

SECRET/

45

MORE_RECTED 76409347

SECRET

46

SECRET/

SECRET/

47

MORI DocID: 1409347

SECRET /

SECRET /

SECRET/

SECRET/

MORE DocID: 7409347

SECRET/

50

SECRET/

SECRET/

SECRET/

52

SECRET/

SECRET/

SECRET/

SECRET/

SECRET/

SECRET/

SECRET/

SECRET/

SECRET/

SECRET/

SECRET/

SECRET/

SECRET/

# (U) INVESTIGATIONS

## (U) INVESTIGATIONS STAFF OVERVIEW

(U/ [ ] The Investigations Staff investigates possible violations of statutes, regulations, policies, and procedures, as well as allegations of waste, fraud, mismanagement, abuse of authority, and substantial dangers to public health and safety related to Agency programs and operations. The Staff oversees the Agency's grievance system and conducts proactive initiatives aimed at detecting and preventing fraud, waste, and abuse.

[ ] A majority of the Staff's personnel continue to be devoted to resource-intensive investigations concerning detention and interrogation activities in Iraq, Afghanistan, and elsewhere. These investigations focus on the circumstances surrounding the detention, movement, confinement, and alleged abuse of detainees. Two investigations completed in this period concerned the

[ ] Other ongoing investigations are being conducted in conjunction with the Departments of Defense and Justice, as appropriate. The trial of a former Agency contractor indicted on four felony counts of assault of a detainee, who died, has been rescheduled for early 2006. This matter is the first US prosecution of a civilian for abuses committed in Afghanistan. The Inspector General regularly informed the Congressional oversight committees of progress in these investigations.

(U/ [ ] The Staff conducted a range of other investigations, including allegations of fraud by employees and contractors, possession of child pornography, misuse of a government intelligence collection system, unauthorized shipments of firearms, misappropriation of funds, and false statements and claims. Judicial proceedings are under way in several cases. The

SECRET/

Staff, additionally, tracks the progress by Agency components in fulfilling outstanding recommendations from completed investigations.

(U/    ) As a result of Staff investigations, one employee reimbursed the government $8,800 for embezzlement of funds after the Department of Justice (DoJ) declined prosecution. Another employee reimbursed $4,500 for receipt of duplicate funds for academic training. In a third case involving civil service annuity fraud investigated in conjunction with the Office of Personnel Management (OPM) OIG, the government recovered $107,958. In a fourth case, the government recovered $45,045 for unauthorized cell phone calls. In two other cases, a contractor reimbursed the government $11,217 for hours mischarged by an employee and an independent contractor made reimbursement of $10,724 for mischarged hours.

(U/    ) As the Staff's workload continues to expand, it has hired three experienced Agency officers as investigators and has issued conditional offers of employment to six other individuals with Federal law enforcement experience. Staff recruitment remains a priority. Advancing the information technology arena remains an equally critical priority for the Staff, as it seeks to identify and deploy software to manage its workflow and organize and search the voluminous records received in investigations. Outreach efforts—in the form of regularly scheduled lectures at CIA and Intelligence Community courses and liaison with other Federal Assistant Inspectors General for Investigation—continued to reap positive benefits.

(U/    ) The Staff continues to oversee the Agency-wide grievance system, which seeks to resolve grievances at the lowest possible level in the organization. In addition to sponsoring a yearly grievance counselor workshop for component and directorate grievance officers, the Staff hosts quarterly meetings of grievance officers to share issues of common interest, and it conducts mandatory training for all new grievance officers. This training,

SECRET/

together with the emphasis on resolution at the lowest possible level, continues to contribute to effective and timely grievance resolution.

SECRET/

SECRET /

SECRET/

MORE DOC ID: 70409347

SECRET/

SECRET/

SECRET/

SECRET/

SECRET/

SECRET/

SECRET//

SECRET/

# (U)  SPECIAL REVIEWS

(U/☐☐☐ Special reviews are undertaken by ad hoc teams under the leadership of a senior OIG officer to address issues of special concern identified by the Congress, senior CIA leaders, or the Inspector General.

SECRET/

70

SECRET/

# (U) STATISTICAL OVERVIEW

## (U) Audit Staff

(U/    ) During the period 1 July to 31 December 2005, the Audit Staff issued 11 reports and made 48 recommendations to improve accounting and financial management, facilities management, and general management.

(U) The Audit Staff had 18 audits and reviews ongoing at the end of the reporting period.

## (U) Inspection Staff

(U) During the last six months of 2005, the Inspection Staff completed seven inspections. At the end of the reporting period, the Staff also had five ongoing inspections. In addition, the Staff closed five inspections.

## (U) Investigations Staff

(U/    ) The Investigations Staff completed work on 139 matters of various types during this reporting period. Of this number, 21 cases were of sufficient significance to be the subject of a final report—7 Reports of Investigation and 14 Disposition Memoranda.

(U/    ) During this period, the IG formally referred 10 matters to DoJ based upon a reasonable belief that violations of Federal criminal law may have been committed.

(U/    ) Recoveries on behalf of the US Government during this reporting period, as a result of the Investigations Staff's efforts, totaled $188,343.

SECRET/

(U)  As of 31 December 2005, 153 matters were in various stages of review by the Investigations Staff.

## (U)  Special Reviews

(U)  During the period, the office closed two special reviews.

SECRET/

SECRET/

# (U)  COMPLETED AUDITS
### 1 July - 31 December 2005

## (U) Financial Management

### (U)  Central Intelligence Agency Fiscal Year 2005 Financial Statements

## (U) Information Technology

### (U)  CIA Management of Laptop Computers

## (U) Procurement

Facilities Support Project Management Practices at the

## (U) Field Activities

SECRET/

# (U) COMPLETED INSPECTIONS
## 1 July – 31 December 2005

(U)  Office of Asian Pacific, Latin American, and African Analysis

(U)  CIA University

(U)  Europe Division

(U)  Research and Development in the CIA

(U)  Leadership Analysis Follow-Up

(U)  The DI's Senior Analytic Service

(U)  Review of CIA's Pre-9/11 Reporting on the Relationship
     Between Saddam's Regime and al-Qa'ida


# (U) CURRENT INSPECTIONS
## 31 December 2005

(U)  Agency Performance on North Korea

(U)  CounterTerrorism Center

(U)  Office of Near East and South Asian Analysis

(U)  Information Management  Services

(U)  Agency Performance on Russia

MORE R073D 6409347

SECRET/

# (U)  COMPLETED INVESTIGATIONS
## 1 July – 31 December 2005

(U)  Conversion of Government Funds

(U)  Alleged Contract Improprieties

(U)  Potential False Claims – False Statements

(U)  Fraudulent Reimbursement for Academic Training

(U)  Possible Conflict of Interest

(U)  Alleged Fraud Concerning Separate Maintenance Allowance

(U)  Alleged Conflict of Interest – Contract Improprieties

(U)  Allegations of Time and Attendance (T&A) Abuse

---

* (U)  These investigations resulted in a Disposition Memorandum rather than a Report of Investigation.

SECRET/

MORI DocID: 2409347

SECRET/

(U)  Board Appeal – FERS Special

(U)  Agency Internet Personal Use for Adult Pornography

(U)  Counterfeit Goods

(U//_____ Embezzlement of Government Funds and False Statements

(U)  Alleged Contract Improprieties

Alleged Abuse of Iraqi Prisoners

(U)  Alleged Medical Leave Bank Abuse

(U)  Potential False Claims and False Statements

(U)  Theft of Government Funds

(U//_____ Misuse of a Government Intelligence Collection System

(U//_____ T&A Abuse by _____ Contractor

SECRET//

# (U)  CURRENT INVESTIGATIONS
## As of 31 December 2005

| Category | Number of cases |
|---|---|
| **Grievances** | |
| Assignment | 2 |
| Promotion | 1 |
| Other – Grievance | 5 |
| **Board Appeals** | 2 |
| **General Investigations** | |
| Criminal and Prohibited Acts | |
| Conflicts of Interest | 8 |
| Embezzlement | 4 |
| False Claims – Other | 10 |
| False Claims/Statements/Vouchers | 8 |
| False Claims - Time & Attendance | 13 |
| False Claims – Visa/Passports | 1 |
| Firearms | 3 |
| Megaprojects | 5 |
| Misconduct – Employee | 6 |
| Misconduct – Management | 6 |
| Obstruction of Justice | 2 |
| Procurement Fraud | 16 |
| Theft/Misuse of Government Property | 4 |
| Waste | 2 |
| Other - Administrative/Criminal | 38 |
| Unsubstantiated Allegations | 17 |
| **Total Ongoing Cases** | 153 |

MORE POLDER 409347

SECRET/

SECRET/

<u>James Madison Project v. CIA</u>, Civil Action No. 08-0708 (D.D.C.)(JR)

# EXHIBIT "6"



PRINTER-FRIENDLY FORMAT
SPONSORED BY


**October 23, 2007**

# C.I.A. Chief Defends Review on Agency's Inspector General

**By MARK MAZZETTI**

WASHINGTON, Oct. 22 — The director of the Central Intelligence Agency on Monday vigorously defended the agency's examination of its own inspector general, calling it a "management review" intended to improve investigations by that independent internal watchdog.

The director, Gen. Michael V. Hayden, said he had ordered the review after hearing reports about the conduct of Inspector General John L. Helgerson that "raised questions in my mind" about how Mr. Helgerson's office was carrying out its investigations of C.I.A. programs.

The comments by the director, in an appearance on the PBS television program "Charlie Rose," were his first public remarks on the subject since news reports this month disclosed the existence of the internal review.

General Hayden did not specify what in particular concerned him about the investigations by Mr. Helgerson's office. He said a small group led by Robert L. Deitz, a close aide to the director, had been working on the review since April and would deliver a report within "the next week or so."

"This was designed to be low key," he said.

The review has drawn criticism from Democrats and Republicans alike on Capitol Hill, who have suggested that it could have a chilling effect on Mr. Helgerson's independence.

Mr. Helgerson's office has investigated some of the most controversial programs undertaken by the agency since the Sept. 11 attacks, including its efforts to detain and interrogate leading terrorism suspects and its program of "extraordinary rendition": the practice of capturing suspects and delivering them to authorities in other nations.

The inspector general's investigations have bred resentment among some at the agency, who say the inquiries amount to second-guessing of C.I.A. operatives in dangerous field assignments.

Copyright 2007 The New York Times Company

<u>James Madison Project v. CIA</u>, Civil Action No. 08-0708 (D.D.C.)(JR)

# EXHIBIT "7"

# washingtonpost.com

# Lawmakers Criticize CIA Director's Review Order

Congress Wants to Protect Investigator's Independence

By Walter Pincus
Washington Post Staff Writer
Saturday, October 13, 2007; A03

A decision by the CIA director, Gen. Michael V. Hayden, to order a special review of efforts by CIA Inspector General John L. Helgerson to probe the agency's past interrogations and imprisonment of terrorism suspects evoked concern yesterday among congressional staff members and lawmakers.

The review is the latest reflection of disagreement within the CIA about the legality and appropriateness of the agency's treatment of suspects since 2001, including its decision to hold nearly 100 in secret prisons, to subject more than a dozen to extraordinarily harsh interrogation techniques, and to fly others to countries where torture is frequently practiced.

The agency's leadership, including its lawyers, has been sparring with the inspector general's office for several years about those practices, and since 2004 has been questioned by Helgerson about allegations that CIA officers engaged in criminal activities in Iraq.

A secret report completed by Helgerson in 2004 concluded that some CIA interrogation practices might violate international law, a conclusion that jarred the agency officials who had relied on Justice Department assurances that such practices were legal.

Rep. Silvestre Reyes (D-Tex.), chairman of the House Permanent Select Committee on Intelligence, said in a statement yesterday that the review of the agency's inspector general that Hayden ordered is "troubling" because of its possible impact on the official's independence, "which Congress established and will very aggressively preserve."

Sen. Christopher S. Bond (R-Mo.), vice chairman of the Senate intelligence committee, warned in a statement that Congress depends heavily on the inspector general's help to oversee the CIA's activities. He promised to "be watching carefully to make sure that nothing is done to restrain or diminish that important office."

Helgerson informed staff members of the Senate committee last week, during a routine briefing on his investigations, that he is the subject of a review ordered by Hayden. The Los Angeles Times and the New York Times disclosed the existence of the review in yesterday's editions.

The review is being conducted by Hayden's senior counselor, Robert L. Deitz, and has raised concerns among Helgerson's staff, said officials familiar with it. "Some people complained, and they were loud enough that we wanted to see if there was a problem," a Senate staff member said, requesting anonymity because he was not authorized to discuss the subject. "There is no judgment. We just asked him [Helgerson] about it."

Deitz is to meet with the staffs of both House and Senate committees on Tuesday, a senior intelligence officer said. In December, Deitz told an American Bar Association conference that "we need to give more credit to

Advertisement

YOURS IS A
STUDY BREAK
THE INSPIRON 530

intel
Core 2
Duo
Do More

SHOP NOW

DELL
YOURS IS HERE

people in these positions of authority, heads of NSA, CIA, DIA. These are not a bunch of corrupt politicians who are making decisions to cover their careers. These are well-intentioned people who are deeply concerned about keeping America safe."

Deitz's review of Helgerson began in April when Hayden started getting reports that Helgerson's staff was carrying on its investigations with "a prosecutorial mentality and the director could not ignore them," a senior intelligence official said.

Summing up the views of the agency's clandestine operators, the senior intelligence official said, "They find the CIA general counsel says a technique is okay, the IG months or years later says no." That situation, he added, "leads first to job anxiety, then to a drop in morale and, finally, to risk aversion."

Another intelligence official said there had been other complaints about the work of the IG's office, including the length of time that investigations went on and claims of bias in the IG's approach to fact-finding.

CIA spokesman Paul Gimigliano said that Hayden "firmly believes that the work of the Office of Inspector General is critical to the entire agency" and since taking over CIA "has accepted the vast majority of its findings." He described Dietz, who served as National Security Agency general counsel when Hayden headed that agency, as "a seasoned observer" from outside the agency who can "if need be, suggest specific improvements for consideration by the [IG] unit itself."

The senior intelligence official described it as an "effort in-house to determine whether the complaints [Hayden] was receiving had merit," the senior intelligence official said. "Nothing that rises to the level of asking some outside group to put this IG under a microscope." It was to be, he added, "a careful, discreet inquiry."

Suzanne Spaulding, a former CIA associate general counsel and former senior staff member on the Senate and House intelligence panels, said the review had created "an appearance of attempted intimidation" of the inspector general.

But Jeffrey H. Smith, CIA general counsel during the Clinton administration, cautioned yesterday that "inspector general second-guessing on legal authority, using their own lawyers, may result in risk aversion by officers in the future." He added that an IG "is engaged in looking backwards with 100 percent clarity and does not have the pressures on them and risks the operators face."

Smith noted that the CIA inspector general not only finds facts but also suggests "what disciplinary actions should be taken. That converts him into a prosecuting attorney."

*Staff researcher Julie Tate contributed to this report.*

**View all comments** that have been posted about this article.

© 2007 The Washington Post Company

**Ads by Google**

**Best Practice BI Paper**
Don't Build A Business Intelligence Competency Center Without It.
Cognos.com/best-practices

**Market Intelligence**
Market leading software for your intelligence process
www.comintell.com

**Al Franken for Senate**
Ready for real change? Join our grassroots effort.
AlFranken.com

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| | * | |
| JAMES MADISON PROJECT | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Civil Action No. 08-0708 (JR) |
| | * | |
| CENTRAL INTELLIGENCE AGENCY | * | |
| | * | |
| Defendant. | * | |
| | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

**RESPONSE TO DEFENDANT'S LOCAL RULE 7(h) STATEMENT OF
MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE ISSUE**

Pursuant to Local Rule 7.1 (h), the plaintiff respectfully responds to the defendant's

Statement of Material Facts as to Which There is No Genuine Issue with the following

statement, which is supported by the Rule 56(f) Declaration of Bradley P. Moss, Esq.,

Deputy Executive Director, James Madison Project ("Moss Decl.").

   1.  Plaintiff does not dispute this statement.

   2.  Plaintiff does not dispute the factual recitations of these statements.

   3.  Plaintiff does not dispute the factual recitations of these statements.

   4.  Plaintiff does not dispute this statement.

   5.  Plaintiff does not dispute the factual recitations of these statements in that

processing was concluded after searches were undertaken, but does dispute any legal

characterizations or conclusions that such searches were diligent, adequate, or reasonable

enough to locate any responsive records. Moss Decl. at ¶¶ 11,18.

   6.  Plaintiff does not dispute the factual recitations of these statements in that

particular components and databases were identified particular components and databases

as those which would be searched for responsive records, but does dispute any legal or factual characterizations or conclusions that those components and databases were most likely to have responsive records or were the only components or databases that could contain responsive records. Plaintiff also does not dispute the factual recitations of these statements in that the CIA utilized specific search terms to conduct the search, but does dispute any legal or factual characterizations or conclusions that the particular search terms rendered the search adequate or reasonable enough to locate any responsive records, or that additional search terms should not have reasonably been utilized. Moss Decl. at ¶¶ 16-17.

7.   Plaintiff does not dispute the factual recitations of this statement in that the searches conducted failed to locate any responsive records, but does dispute any legal characterizations or conclusions that such searches were diligent, adequate, or reasonable enough to locate responsive records. Moss Decl. at ¶ 18.

8.   Plaintiff does not dispute the factual contents of the CIA's letter dated July 11, 2008.

Date:   August 11, 2008

Respectfully submitted,

/s/
_____
Bradley P. Moss, Esq.
D.C. Bar #975905
Mark S. Zaid, Esq.
D.C. Bar #440532
Mark S. Zaid, P.C.
1250 Connecticut Avenue, N.W.
Suite 200
Washington, D.C. 20036
(202) 454-2809
(202) 330-5610 fax

Brad@MarkZaid.com
Mark@MarkZaid.com

Kelly Brian McClanahan
NYS Bar #4563748
Mark S. Zaid, P.C.
1250 Connecticut Avenue, N.W.
Suite 200
Washington, D.C.  20036
Kel@JamesMadisonProject.org

Of Counsel

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| | * | |
| JAMES MADISON PROJECT | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Civil Action No. 08-0708 (JR) |
| | * | |
| CENTRAL INTELLIGENCE AGENCY | * | |
| | * | |
| Defendant. | * | |
| | * | |

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

## <u>ORDER</u>

Upon consideration of plaintiff's Opposition to Defendant's Motion for Summary Judgment, and it appearing that the relief prayed is just and appropriate, it is this _____ day of _____ 2008,

ORDERED, that defendant's Motion is denied; and

FURTHER ORDERED, that the request be remanded to the Central Intelligence Agency for a more detailed declaration on the adequacy of the search as set forth in the accompanying Memorandum Opinion; or, alternatively

FURTHER ORDERED, that the plaintiff is permitted to undertake limited discovery as set forth in the accompanying Memorandum Opinion.

Date:   August 11, 2008

_____
UNITED STATES DISTRICT JUDGE